McDONNELL v. CENTRAL DRUG CO.

1. Master and Servant — Fellow-Servant — Negligence — Instructing Employé.

In issuing to another servant orders to instruct decedent how to charge a tank with soda water, the employé who had charge of the soda department of defendant, and of the charging of soda fountains, represented the master, and negligence of the servant so directed by him in performing such duty was not the negligence of a fellow-servant.[1]

2. Same—Safe Appliances—Inspection.

Where plaintiff charged defendant with negligence in furnishing a defective tank to be charged by decedent, defendant could not complain of instructions to the jury that defendant was called upon, in making an inspection, to do what a reasonable man of ordinary prudence would do to keep the tank in a reasonably safe condition; the words " in making an inspection," did not prejudice defendant.

3. Damages—Trial—Evidence—Estates of Decedents.

Evidence that decedent sent a sum of money to his father, which was not shown to have been a contribution to his family, was erroneously received; but the error was cured by the court withdrawing such evidence from the consideration of the jury by its instructions thereto, in pursuance of a request of defendant's attorney.

4. Trial—Special Questions—Master and Servant.

The trial court, on its own motion and with the consent of counsel, properly submitted to the jury a special question relating to the source from which decedent received instructions, if any.

5. Same.

Held, that the verdict was not against the weight of the evidence.

6. Damages—New Trial.

A verdict of $6,268.01 in favor of decedent's widow whom he had abandoned, and to whom he had made no contributions for a considerable period preceding his death, was exces-

[1]As to whether the duty of the master to instruct or warn servants is delegable, see note in 26 L. R. A. (N. S.) 624.

sive, and is held to have been brought about by inflammatory language of plaintiff's attorney: $3,000 *held* to be reasonable under the evidence.

Error to Wayne; Murphy, J. Submitted January 4, 1912. (Docket No. 164.) Decided May 31, 1912.

Case by Ella McDonnell, administratrix of the estate of Michael McDonnell, deceased, against the Central Drug Company for the negligent killing of decedent. Judgment for plaintiff. Defendant brings error. Reduced and affirmed.

*O. E. Butterfield* (*J. W. Dohany*, of counsel), for appellant.

*Sloman & Sloman* (*J. N. Beckinstein*, of counsel), for appellee.

BROOKE, J. This case has been in this court once before and will be found reported at 160 Mich. 455 (125 N. W. 546), where a sufficient statement of facts will be found. A second trial in the court below has resulted in a verdict for plaintiff in the sum of $6,268.01, and defendant has removed the case to this court for review. There are some 76 assignments of error which are treated by defendant under the following heads:

" (1) The proximate cause of the death of the plaintiff's intestate was the negligence of David Berlin, a fellow-servant with the deceased, for whose acts no recovery can be had in this case.

" (2) There is no evidence of negligence on the part of the defendant in respect to the condition of the tank.

" (3) The verdict is excessive.

" (4) The court erred in admitting evidence of payments made by Michael McDonnell to his father and in refusing to charge as requested by the defendant in respect thereto.

" (5) The verdict was induced, in part at least, by intemperate language in the argument of counsel for plaintiff.

" (6) The submission to the jury by the court on its own motion of the special question whether Berlin was

directed by Larkins to show McDonnell how to charge the tank, was reversible error.

"(7) The verdict is clearly against the overwhelming weight of the evidence."

We will consider defendant's claims *seriatim*.

1. The testimony upon this trial as to Berlin's connection with the matter is not materially different from that offered at the former trial. At this trial a special question was submitted to the jury, as follows:

"Did Larkins direct Berlin—meaning David Berlin—to instruct McDonnell how to charge the tank?"

This question was answered in the affirmative by the jury. If, therefore, the assertion of defendant is true that McDonnell's death was due to Berlin's negligence, it does not follow that Berlin was a fellow-servant of McDonnell, and therefore that defendant is not liable. In our former opinion, under the head of "Fellow-servant," this question is discussed, and we there held that if the master delegated to Berlin the duty of instructing McDonnell how to fill the tank, Berlin's negligence in carrying out those instructions would be the negligence of the master. We perceive no reason for changing our views there expressed. It is urged, however, that there is no evidence tending to show that the defendant had authorized Larkins to direct Berlin to give lessons to new employés. Mr. Rank, the general manager for defendant, testified that Larkins had charge of the soda department under Mr. Tabor, and that one of his duties was to see that the fountains and so on were charged. We find no difficulty in holding that, under the circumstances of this case, Larkins must be considered as representing the master in issuing the order to Berlin.

2. Defendant's second proposition is, we think, answered contrary to its contention by the holding in our former opinion under the head "Jury's Duty." The tank which exploded was an appliance of the simplest character imaginable. It was concededly old. According to

testimony on the part of the plaintiff, it was badly rusted and scaled. It was in use in a place and under circumstances highly conducive to rust and deterioration, evidences of the existence of which were plainly visible. The measure of duty imposed upon the defendant by the charge of the learned trial judge was that:

"The defendant was called upon, in making an inspection of this tank, to do what a reasonable man of ordinary prudence would do to keep that tank in a reasonably safe condition."

It is argued on behalf of defendant that, inasmuch as there was no testimony showing what inspection was usual or customary as to such apparatus, this charge was erroneous, in that it permitted the jury to establish a rule of inspection for themselves. We are of opinion that the cases cited in support of this contention are not here applicable. As we read the declaration, the negligence charged upon this point is not that the defendant failed to make a reasonable inspection of the tank, but that it was negligent in failing and neglecting to furnish sound and safe tanks to be filled. The words "in making an inspection of this tank" might very well have been omitted from the excerpt given above, but we cannot say that the jury was misled by their use, or that too high a degree of care was thereby imposed upon the defendant. Whether the defendant maintained a tank reasonably safe, by inspection and repair or by substituting new for old, is of no consequence. Its duty was to use reasonable care to so maintain this appliance. The plaintiff having shown the alleged defective condition of the tank, the explosion, and injury consequent thereon, a situation has arisen which, as we said before, "would have warranted the finding that the explosion was due to the rusted and weakened condition of the tank, which was properly chargeable to the master's neglect."

3. This will be treated hereinafter in connection with "5."

4. If any error was committed in the admission of the

testimony of which complaint was made, it was cured by the charge:

" There is no evidence in this case that the sum of $130 (which) is alleged to have been sent by the deceased to his father during the 11 months preceding his death contributed in any respect to the support of his family; nor is there any evidence in the case that any of the money alleged to have been sent by the deceased to his father during the 11 months before his death was credited on any account for which Mrs. McDonnell or any member of her family was liable.    Therefore any such money could not be regarded as a contribution to the support of the family.'

This instruction is in the precise language of defend-, ant's requests upon the subject.

6. This was urged as one of the grounds for a new trial. In denying the motion, the trial judge asserts that, before submitting the special question, he secured the assent of both counsel to such a course.    In thereafter submitting the special question, though not acting strictly in conformity with the provisions of 3 Comp. Laws, § 10237, we are of opinion that the trial judge acted with propriety, relying upon the express assent of counsel, who should not now be permitted to question the course taken because the result may be unsatisfactory.

7. We are not prepared to say that the verdict is so clearly against the weight of the evidence as to demand judicial interference upon that ground.    As to the old and defective character of the tank, the evidence is voluminous.    Touching the point raised by the special question, there was a decided conflict in the testimony.    One witness, Berlin, swore positively that Larkins gave him the order, and Larkins as positively denied it.    One significant fact remains, however, and that is that Berlin, whether for the purpose of instruction or otherwise, actually did take McDonnell into the cellar with him and made use of him as an assistant in charging the tank.

3 and 5. We will discuss these two grounds together, and first as to 5.    In his closing argument to the jury, counsel for plaintiff used the following language:

"The course that has been taken here is worthy of a pirate in the days of old; the old buccaneers, who had no sympathy with their victims, who would just as lief crush them out to death, and then revile them afterwards, with impunity, without a wink; just stop and think of it. What has happened here? The meanest dog on the face of the globe, the worst criminal on the face of the earth, is given a reasonable trial, is afforded a fair opportunity to prepare for eternity; but poor Michael McDonnell, as straight and square a man as ever breathed a breath of life, was sent to death, without even the ordinary warning, without even the ordinary common decency that would be extended to the most humble and the worst criminal on the face of the globe. When a man is tried and condemned to death, he is allowed an opportunity to prepare for his inevitable end; but Michael McDonnell was sent into this cellar, reeking with slime and smells, in that sewer, without warning or chance to make peace with his Maker, without the remotest idea that he was coming in contact with something that was going to deprive him of his life, take his life from him, murder him.

"*Mr. Dohany:* I take an exception.

"*Mr. Sloman:* And, not content with robbing this man of his life, the only thing he has left to his family, his widow, and his children, the heritage of his good name, they must come in now and blast it.

"*The Court:* I do not think there is warrant in saying this homicide was a murder. Therefore, gentlemen of the jury, that must be disregarded and not be permitted to influence you in your deliberations.   *   *   *

"*Mr. Sloman:* Talk of negligence, if that does not border on criminal negligence, what does? If people cannot be held responsible for things of that kind, I ask you, in the name of fairness and common honesty, when can they be? Day in and year out that tank stands here in that wet and damp and slimy condition. You remember the testimony of one witness upon the part of the defendant, who told how even the sewer was, there was that drain, the center of it a few inches below the level of the floor. Why was that? Because they did not have the fall; they could not get a fall. Would you want to have that on your conscience?

"*Mr. Dohany:* I take an exception to the argument to the jury as to what they would want to do, bringing the matter home to them.

"*Mr. Sloman:* I speak of the generality of men, and I take it you are among the great body of citizenship, among the men in the great walks of life, who have the daily experiences, who have the same heart throbs, who are actuated by the same influences, who are mindful of the rights of individuals like everybody else. I look upon you as human beings who would not dare—your consciences would not permit you—to put men in places of danger that way.

"*Mr. Dohany:* I take an exception to that.    *    *    *

"*Mr. Sloman:* And when that duty presents itself, as it does in this case, free from any obstructions, you ought to discharge that duty to the full, and you ought to give her just what she asks in her declaration in this case, and even that would not compensate her for what she would have asked, and what her children would have asked, had Michael McDonnell been treated even as the commonest criminal on the face of the globe ought to be treated.

"*Mr. Dohany:* I take an exception to that.

"*The Court:* What was the remark? (The stenographer reads it, the court says nothing, and Mr. Sloman continues as follows:)

"*Mr. Sloman:* Had he been given an opportunity for his life down in that hellhole, without a chance to make his peace with his Maker. I don't care what your life or what struggles you have had, but whatever you are, let your mind linger through those long years of memory, and you cannot find such a case of cruelty as is here shown in this case, try as you will. And is a thing of that kind to go unrebuked? Is a jury of Wayne county to say to these Flint people:

"'Go back, there is no such thing as justice in Wayne county, men may be killed, they may be innocent as a babe of the harm they are thrown in, their lives taken from them, and their reputations soiled and destroyed.'"

It is the claim of defendant (and in our opinion the claim is not without reason) that this intemperate argument on the part of plaintiff's counsel in his closing argument induced, in part at least, the verdict rendered. This court has set the seal of its disapproval upon the course here followed many times. See *Spencer* v. *Simmons*, 160 Mich. 292 (125 N. W. 9, 19 Am. & Eng. Ann. Cas. 1126), and cases there cited.

Nothing can here be added which would lend strength to what we have already said upon this subject. The question then is: What should be done with this judgment? The amount fixed by the jury as the present value of the sums which McDonnell would have contributed to his family during his expectancy was $6,268.01. He seems to have started his married life as the owner of a 40-acre farm which he worked for some five years. He then took employment in a railroad in the roundhouse, then became foreman upon an engine, then lived on a rented farm, then became a teamster, then a collector and solicitor for a newspaper, then a solicitor for insurance, then a motorman, then a policeman, then the proprietor of a restaurant, to purchase one-half of which he borrowed some money from his father. Later he bought the other half by executing a mortgage on his home, worth about $700, for $350. At this point in his career he left his wife and family in possession of the restaurant in Flint and went to Detroit, where he lived for 11 months prior to his death. During this period he did not contribute anything to the support of his family, nor visit them. At the time of his death he was 46 years old and was working as porter for the defendant. His duties here were menial in character and such as are usually not very highly compensated. Up to the time he left his family, he had apparently maintained them as well as his circumstances would permit.

To say that this man, during the declining years of his life, with his earning capacity upon the wane (even assuming upon his part a proper disposition to support his family, which may well be doubted), would have contributed such sums of money to them as to produce a present worth equal to $6,268.01 is, in our opinion, gross exaggeration. Inasmuch, therefore, as we find no reversible error in the case unless the inflammatory remarks of counsel should be held to be such, and as the case has already been twice tried, we have concluded that the ends

of justice would be better served by a reduction of the verdict than by a reversal.

The judgment will therefore be reversed, unless the plaintiff shall remit the sum of $3,268.01, leaving the amount thereof $3,000. In which event it will stand affirmed at that figure, with costs of this court to defendant in any event.

MOORE, C. J., and STEERE, McALVAY, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.